# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

MARK A. SUGGS                    :

        Plaintiff,          :

                          Case No. 3:08CV0369

  vs.                            :

                          District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,               :     Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,    :

        Defendant.         :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.   INTRODUCTION

Plaintiff Mark A. Suggs has worked as a laborer, a grader operator, and repairing cars in a body shop. (Tr. 115, 127-32). He sustained a work-related injury when his foot slipped while he was working in the back of a truck and he twisted his back. (*See, e.g.*, Tr. 99, 168). He has not worked since 2002 and claims to be disabled due to constant back pain. (Tr. 114). Consequently, he sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] on March 19, 2004, alleging disability since June 13, 2002. (Tr. 63-65).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Following initial denials of his application, Plaintiff was provided with an administrative hearing (Tr. 320-59), after which Administrative Law Judge ["ALJ"] Thomas R. McNichols II issued a written decision denying Plaintiff's application. ALJ McNichols based his decision on the conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 19-32). The ALJ's non-disability decision later became the Commissioner's final decision. Such decisions are subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff is due in the present case.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. ##10, 11), the administrative record, and the record as a whole.

Plaintiff seeks an Order overturning the ALJ's decision and granting benefits, or at a minimum, remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff's age (52) at the time of ALJ McNichols' administrative decision

categorized him as "closely approaching advanced age" for purposes of resolving his DIB application. *See* 20 C.F.R. § 404.1563(d). (Tr. 31). He has a "limited," 11th grade education. *See* 20 C.F.R. § 404.1564(b)(3). (Tr. 31, 120).

During the ALJ hearing, Plaintiff testified that he stopped working in June 2002. (Tr. 328). He continues to have back pain due to protruding discs and nerve and muscle damage. (Tr. 329). He has not had any back surgery. (*Id.*). At the time of the hearing, Plaintiff still was being treated by a pain management specialist who was evaluating him for a spine stimulator to help with pain. (Tr. 330, 349). He takes pain medication and sleep medication at night. (Tr. 333). He has not been hospitalized since he stopped working. (Tr. 334). Plaintiff testified that his pain is constant, all day, everyday. (Tr. 334-35). On a typical day, the pain is a nine and one-half on a scale of zero to 10. The pain goes into his hips and legs. He can't use a cane because it would put too much pressure on his back. (Tr. 335).

Plaintiff estimated that he could walk about half a city block. (Tr. 336). He testified that his problems were getting worse, with increasing numbness in and "giv[ing] out" of his left leg. (*Id.*). He believed that he could stand for about 10 minutes or sit for about 15 to 20 minutes before having to move around. (Tr. 336-37). He could lift a gallon of milk but it would hurt to do so. (Tr. 337). Climbing

stairs requires a handrail and "hurts severely." (Tr. 338). Plaintiff did not think that he could do even a job that permitted him to sit part of the time, because "when the pain gets going in my back it just . . . it doesn't let up." (Tr. 338-39).

As to his daily activities, Plaintiff testified that he usually cooked his daughter breakfast in the morning and occasionally did the dishes. (Tr. 339). He further testified that he could not sweep, mop or vacuum, and did not do the laundry. (*Id.*). If he went to a grocery store, he walked holding onto a cart. (Tr. 339-40). He was able to feed, dress and groom himself, but wore slip-on shoes because he could not bend to tie other shoes. (Tr. 343). On a typical day, Plaintiff usually got up with his daughter to send her off to school. (Tr. 343-44). He then would shave, watch television, take a pain pill and lie down to get comfortable until lunchtime. (Tr. 344-45). He goes into the yard to watch and play with the dog (Tr. 341, 345), and he helps his daughter with her homework. (Tr. 340, 346). He visits with friends and relatives. (Tr. 340, 345, 346). Plaintiff babysits for his girlfriend's three-year-old granddaughter "every chance I get." (Tr. 345-46).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources.

<u>Aivars Vitols, D.O.</u>  Plaintiff presented to Dr. Vitols, an orthopedist, on June 21, 2002, complaining of intermittent low back pain after slipping and twisting his back.  Examination revealed a normal gait, paralumbar muscle spasm, midline tenderness, decreased lumbar range of motion, intact reflexes, normal strength and negative straight leg raises.  (Tr. 192-93).  Dr. Vitols diagnosed a lumbar sprain and strain and recommended physical therapy.  (*Id.*).  On August 7, 2002, Plaintiff reported less pain.  (Tr. 191).  Examination revealed spasm and restricted motion.  (*Id.*).  Dr. Vitols noted that Plaintiff showed "slow steady improvement" with conservative care and treatment.  (*Id.*).  Similar complaints and findings were reported in September and October 2002.  (Tr. 188, 190).  A TENS unit "definitely seems to help," but Plaintiff was "not using it all day," only "off and on."  (*Id.*).   Reporting that disc protrusions with bulging were noted at L3-4 and L4-5, Dr. Vitols recommended epidural blocks.  (*Id.*).

An MRI of the lumbar spine from October 11, 2002, showed mild right posterolateral disc protrusion at the T12-L1 level with a small central disc protrusion at L4-5.  There was annulus bulging at L3-4 on the left, and to a mild degree diffusely at L4-5 and L5-S1 levels as well.  (Tr. 189).

Three lumbar epidural injections at L4-5 were performed by Charles Demirjian, M.D., between August and October 2003.  (Tr. 171-76).  Plaintiff

reported some initial improvement but no sustained response to the injections. (Tr. 171). At that point, Dr. Vitols felt that he had nothing more to offer Plaintiff, since all conservative treatment had failed. (Tr. 183-84).

Dr. Vitols again examined Plaintiff on April 12, 2007, at the request of the Ohio Bureau of Disability Determination ["BDD"]. Upon examination, Plaintiff's upper extremities appeared normal. Grip strength and manipulative ability were maintained bilaterally. Hip motion was unrestricted. Dr. Vitols' impression was chronic lumbosacral sprain and strain. Dr. Vitols opined that the Plaintiff can lift as much as 20 pounds and can carry as much as 10 pounds occasionally. He cannot sit, stand or walk for sustained periods (no more than one hour at a time). He can sit up to four hours and stand and walk as much as two hours each during any given eight-hour workday. Dr. Vitols concluded that Plaintiff does not require an ambulatory aid. (Tr. 299-314).

<u>Daniel Franklin, M.D.</u> In April 2003, Plaintiff was sent for an independent medical examination in relation to his Workers' Compensation claim. (Tr. 168-70). He reported that he was using a TENS device frequently and that this decreased his pain level from a six to a five on a scale of zero to 10. He reported left leg numbness precipitated by prolonged sitting. Plaintiff noted that he could handle a gallon of milk, but not much more weight. Walking more than one-half

block increased his back pain. He noted that his sleep was too restless to share a bed with his wife. He was able to help only minimally around the house.

Examination revealed that flexion was limited to 20 degrees with zero degree extension and 18 degree side-bending. There was tenderness from L2 through the sacral area. The left thigh was one-half inch smaller than the right. Dr. Franklin opined that Plaintiff had reached maximum medical improvement and would be limited to "essentially sedentary to light work with maximal lifting not to exceed 15-20 pounds and frequently lifting not to exceed 10 pounds." Dr. Franklin noted that bending at the waist should be infrequent and that Plaintiff should be able to "change body positions from sitting to standing or standing to sitting and/or walking, 3 times an hour."

Scott West, D.O. Plaintiff saw Dr. West for evaluation on December 10, 2003. (Tr. 177-78). Dr. West noted palpable tenderness in the lower lumbar region. Flexion was limited to 20 degrees and side bending to 10 degrees to the left and 15 degrees to the right. There was some weakness of the quadriceps muscle function as well as extensor hallucis longus muscle function on the left when compared to the right. Straight leg raising was positive for low back pain at 45 degrees on the right and at 30 degrees on the left, causing both low back pain and left leg pain. (*Id*.). Dr. West reviewed the MRI, noting the disc

protrusions, and diagnosed small disc herniations at L3-4 and L4-5 left. He saw no severe nerve root compression warranting surgical intervention. (*Id.*).

James B. Hoover, M.D. Plaintiff was examined by Dr. Hoover in December 2003, in relation to his Workers' Compensation claim. (Tr. 179-81). Dr. Hoover's examination showed limited range of motion of the lumbar spine. Straight leg raising in the supine position was positive for back pain at 40 degrees on the right and 20 degrees on the left. There was some decreased strength in the lower extremities. (Tr. 180). Dr. Hoover opined that Plaintiff had reached maximum medical improvement and no longer would be able to perform his past work. According to Dr. Hoover, Plaintiff could stand or walk up to 30 minutes at a time for up to four hours per eight-hour day, and could sit up to 30 minutes at one time for up to five hours per eight-hour day. Dr. Hoover noted that Plaintiff could stoop and squat and lift 20 pounds only occasionally, and could lift 10 pounds frequently. (Tr. 181). Dr. Hoover found "no objective reason why [Plaintiff] could not do a job within those physical parameters mentioned above." (*Id.*).

Richard Donnini, M.D. Dr. Donnini began treating Plaintiff in April 2004. (Tr. 243-46). He noted that Plaintiff experienced moderate discomfort with heel-and-toe walking and getting on and off the exam table. Plaintiff was in generally

poor condition. (Tr. 244). Range of motion of the lumbar spine showed only 35 degree flexion, 5 degree extension, 20 degree right lateral bending and 30 degree left lateral bending. Strength and sensation were within normal limits except for some paresthesias of the left lateral thigh. (Tr. 245). Dr. Donnini recommended a stretching and strengthening exercise program, continued use of a TENS unit, and medications. (Tr. 245-46). Dr. Donnini performed a series of selective nerve root blocks at L4-5 and L5-S1 in September and August 2004. (Tr. 230-33).

Dr. Donnini also adjusted Plaintiff's medications. (Tr. 224, 226). Plaintiff continued to report muscle spasms, muscle weakness and loss of sensation. (Tr. 218). Two additional blocks were performed in December 2004. (Tr. 227-28).

A lumbar spine MRI from July 2005 showed a broad-based left lateral and posterolateral disc protrusion at L3-L4 with some lesser annulus bulging on the left at L4-L5, and facet arthritic changes bilaterally at L4-L5 and L5-S1. (Tr. 249).

Plaintiff continued to treat with Dr. Donnini. (Tr. 273-85). Examinations showed lumbar tenderness and spasms. (*Id.*). An EMG from January 2006, showed electrophysiologic evidence of "chronic and perhaps some acute component of lumbosacral nerve root irritation on the left that is best localized to the L5 level." (Tr. 250). There was no evidence of radiculopathy on the right, but

there were some bilateral sensory changes suggestive of very mild distal peripheral neuropathic process.  (*Id.*).

In October 2006, Dr. Donnini reported to Plaintiff's counsel that Plaintiff continued to have localized tenderness of the paraspinous muscles and facet joints bilaterally from L2 to S1.  (Tr. 247-48).  Dr. Donnini noted that the annular bulging at L4-5 resulted in neural foraminal narrowing on the left and at L3 and L4.  Dr. Donnini's working diagnosis was lumbar disc displacement, lumbar foraminal  stenosis, lumbar radiculitis and chronic lumbosacral sprain/strain. Dr. Donnini noted that physical therapy, medications, injections, TENS, exercises and massage therapy had not provided Plaintiff with any sustained relief, although he obtained some improvement in pain with medications.  (Tr. 247). Dr. Donnini felt that Plaintiff was "not capable of any sustained remunerative employment considering both his extensive past treatment, persistent chronic pain and his inability to function on a regular basis."  (Tr. 248).

Anton Freihofner, M.D.  Dr. Freihofner, a state agency physician, reviewed the medical evidence on behalf of the BDD in May 2004.  (Tr. 194-99).  Dr. Freihofner concluded that Plaintiff has a severe musculoskeletal impairment but that despite such impairment, he could perform work involving medium exertion.  (*Id.*).

Michael R. Stock, M.D.  Dr. Stock, a state agency physician, reviewed the medical evidence on behalf of the BDD in October 2004.  (Tr. 200-07).  Dr. Stock opined that Plaintiff could perform light work exertionally.  (Tr. 201).  He reported that Plaintiff could climb, stoop and crouch only occasionally.  (Tr. 202).

## III.  ADMINISTRATIVE REVIEW

### A.  Applicable Standards

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.[2]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 19-32); *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

---

[2]Impairments also must be expected either to cause death or last 12 months or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## B. The ALJ's Decision

At Step 1 of the sequential evaluation, ALJ McNichols found that Plaintiff met the insured-status requirement for DIB eligibility through December 2006. (Tr. 30). The ALJ also found at Step 1 that Plaintiff had not engaged in substantial gainful activity since his claimed disability onset date of June 13, 2002. (Tr. 31).

The ALJ found at Step 2 that Plaintiff has the severe impairments of chronic back pain secondary to spinal sprain/strain and early degenerative abnormalities affecting the spine. (*Id*.).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Id*.).

At Step 4, the ALJ found that Plaintiff is capable of performing the basic exertional requirements of "light work" as defined for Social Security purposes, if he is limited to no more than occasional climbing of stairs, ladders, ropes or scaffolding; no more than occasional stooping or crouching; no exposure to hazards; opportunities to alternate between sitting and standing at 30-minute intervals; standing and walking no more than four hours total during any given eight-hour workday; no repetitive use of foot controls; and no maintaining concentration on a single task for longer than 15 minutes at a time (due to potential concentration deficits caused by pain). The ALJ further found that Plaintiff is unable to perform his past relevant work as a grader operator, laborer or repairing cars in a body shop, but found at Step 5 that Plaintiff could perform a significant number of jobs in the national economy. (Tr. 31-32). This assessment, along with the ALJ's findings throughout his sequential evaluation,

led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB.  (Tr. 32).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld

"as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V. DISCUSSION

### A. Plaintiff's Contentions

Plaintiff contends that the ALJ improperly rejected the opinions of his treating/consultative orthopedist, Dr. Vitols, and his treating pain specialist, Dr. Donnini, and failed to address the differing limitations identified by various doctors. (Doc. #6 at 11-15). Plaintiff also argues that the ALJ erred in his evaluation of Plaintiff's pain because he relied on outdated medical opinions and overstated Plaintiff's daily life activities. (Doc. #6 at 16-17).

### B. Medical Source Opinions

**1.**

1.      Treating Medical Sources

Key among the standards to which an ALJ must adhere is the principle

that greater deference is generally given to the opinions of treating medical

sources than to the opinions of a non-treating medical source.  *Rogers v. Comm'r of*

*Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2).  This is so,

the Regulations explain, "since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [a DIB

claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examiners, such as consultative examinations

or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at

242.  In light of this, an ALJ must apply controlling weight to a treating source's

opinion when it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record.  *Rogers*, 486 F.3d at 242; *see*

*Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not

deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at

544, but the ALJ's analysis does not end there.  Instead, the Regulations create a

further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a
> treating source medical opinion is not well-supported
> by medically acceptable [data] . . . or is inconsistent with
> other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,'
> not that the opinion should be rejected.

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

2.    Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept or reject the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we

will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d), including, at a minium, the factors of supportability, consistency and specialization.  *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

## C.    Analysis

A review of the ALJ's decision reveals a well-supported summary of the medical source opinions and records.  (*See* Tr. 21-23).  ALJ McNichols began his evaluation of the medical opinion evidence by explicitly acknowledging different doctors' "varying assessments of the claimant's functional capacity" (Tr. 22), accurately observing that those opinions ranged "from an inability to do any work whatsoever (as expressed by Dr. Donnini) to an ability to do medium-exertion work (as expressed by Dr. Freihofner)."  (Tr. 23).  The ALJ correctly set out the applicable legal criteria, both under the treating physician rule and as to the need to continue weighing a treating physician's opinion if controlling weight is not due under the regulatory criteria.  (*See id.*).  The ALJ then correctly listed those additional weighing factors consistent with the Regulations and case law. (*Id.*); *see* 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544.

The record demonstrates that the ALJ articulated appropriate reasons for declining to accord Dr. Donnini's opinion (at Tr. 247-48) controlling weight. The ALJ found that Dr. Donnini's opinion depended too heavily on Plaintiff''s subjective complaints and lacked adequate support from objective findings. (Tr. 24). Focusing on Dr. Donnini's conclusion that Plaintiff "is not capable of any sustained remunerative employment **considering both** his extensive past treatment, **persistent chronic pain,** and **his inability to function on a regular basis**" (Tr. 24, quoting Tr. 248) (emphasis in ALJ decision), the ALJ found that "rather pessimistic assessment" could be attributable only to "uncritical acceptance of the claimant's subjective complaints and allegations." (*Id.*).

Observing that Plaintiff "receives only conservative care and treatment," the ALJ surmised that Plaintiff would have resorted to more aggressive medical intervention were his symptoms in fact as severe as Dr. Donnini's opinion would suggest. (Tr. 24). He noted that Dr. Vitols had reported "[s]low steady improvement" (*id.*, quoting Tr. 191) when treating Plaintiff conservatively with a TENS unit, but that Plaintiff had failed to use that device consistently. (*Id.*, *see* Tr. 190). Perhaps most significantly, he remarked on the fact that Dr. Vitols' April 2007 opinion described seemingly milder restrictions than what Dr. Donnini opined in October 2006. (Tr. 24; *see* Tr. 309-14; Tr. 190-91).

An ALJ is not bound to accept the opinion of a treating physician if that opinion lacks sufficient support in terms of medical signs and laboratory findings, or is either internally inconsistent or inconsistent with other credible evidence of record. 20 C.F.R. § 416.927(c)(2); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 389 (6th Cir. 2004); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001). Having cited evidence in support of his conclusion that Dr. Donnini's opinion lacked a sufficient objective medical foundation and was inconsistent with the findings of Drs. Vitols (Tr. 309-14), Hoover (Tr. 179-81), Freihofner (Tr. 194-99) and Stock (Tr. 200-07), ALJ McNichols did not err in refusing to give Dr. Donnini's opinion controlling weight under the treating physician rule.

The ALJ also did not err in declining to accord controlling weight to Dr. Vitols' opinion. As Plaintiff himself admits (*see* Doc. #6 at 11-14), Dr. Vitols' opinion as to Plaintiff's restrictions differed from those of other consultative examiners who evaluated Plaintiff and/or his medical records, and from that of Dr. Donnini. (*See* Tr. 179-81, 202, 248, 299-314). Such inconsistency alone suffices to warrant a finding that the treating physician rule does not dictate the weight assigned to Dr. Vitols' opinion. *See Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544

Notwithstanding the ALJ's justified failure to apply the treating physician rule, this Court also must determine whether the ALJ continued the requisite

weighing of Drs. Vitols' and Donnini's opinions under the remaining factors. He did not. ALJ McNichols explained that he found an RFC for "light" work to be "a credible compromise between the various opinions contained in the record." (Tr. 24). The ALJ failed to explain, however, how the requisite additional considerations factored in favor of the particular "compromise" at which he arrived. *See Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544. For instance, although he had addressed both the "supportability" and "consistency" factors in declining to give controlling weight to Dr. Donnini's opinion that Plaintiff's pain was disabling, nowhere did the ALJ go on to discuss the "specialization" factor as to Dr. Donnini – a potentially significant oversight, given that Dr. Donnini's specialty is pain management. Theoretically, recognition of Dr. Donnini's specialized experience with pain patients might have lent greater credence to his findings regarding Plaintiff's reports of persistent pain (*see* Tr. 248), and could have affected the weight assigned to his opinion.

Similarly, in passively declining to adopt many of Dr. Vitols' more restrictive opinions,[3] the ALJ failed to mention "the length, frequency, nature, and extent" of Dr. Vitols' treatment relationship with Plaintiff – again, an

---

[3]*See* Tr. 309-14 (opining, *e.g.*, that Plaintiff could lift or carry no amount frequently; stand or walk for no more than two hours total in a workday; and never climb, balance, stoop, kneel, crouch or crawl).

omission of presumptive significance, given that before the ALJ referred Plaintiff to Dr. Vitols for a consultative examination, Dr. Vitols had been the primary orthopedist treating Plaintiff's back injury for over a year after it first occurred. (*See* Tr. 183-93). As Plaintiff aptly notes, the record reflects that Dr. Vitols ended his treating relationship with Plaintiff only after concluding that conservative orthopedic treatment had failed and that intervention by pain specialist Dr. Donnini was warranted. (*See* Doc. #6 at 5-6, 12, 15; Tr. 183-84). In light of that evidence, the ALJ's reliance on Dr. Vitols' 2002 and 2003 observations about Plaintiff's improvement under conservative care (*see* Tr. 188-91) as a basis for dismissing Dr. Donnini's 2006 opinion (*see* Tr. 248) suggests that the ALJ may have failed to consider "other relevant factors," such as the relative timeliness of those opinions. *See Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544.

Although Plaintiff criticizes the ALJ's failure to acknowledge some of Dr. Vitols' more restrictive recommendations (*see* Doc. #6 at 14), an ALJ is not required to discuss every piece of evidence in the record. *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 2004 WL 1153680, at *3 (6th Cir. May 21, 2004). The ALJ's failure to adopt or comment specifically on a particular item in evidence cannot be presumed to mean that he failed to consider it. Nevertheless, the ALJ's failure

to comment on Dr. Vitols' prior treating relationship with Plaintiff <u>does</u> raise

concerns about his compliance with the Commissioner's own procedural

constraints, as courts "require some indication that the ALJ at least considered

[such] facts before giving greater weight to a[ non-treating physician's] opinion.'"

*Blakley v. Comm'r of Soc. Sec.*, No. 08-6270, 2009 WL 3029653, at *9 (6th Cir. Sept. 24,

2009) (citing *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).

Belaboring the point helps drive home its significance under the

Regulations and case law:

> When the treating physician's opinion is not controlling,
> the ALJ, in determining how much weight is
> appropriate, must consider a host of factors, including
> the length, frequency, nature, and extent of the
> treatment relationship; the supportability and
> consistency of the physician's conclusions; the
> specialization of the physician; and any other relevant
> factors . . . However, **in all cases there remains a**
> **presumption, albeit a rebuttable one, that the opinion**
> **of a treating physician is entitled to great deference, its**
> **non-controlling status notwithstanding** . . .

*Rogers*, 486 F.3d at 242 (emphasis added) (citation omitted).; *see also* Social

Security Ruling 96-2p, 1996 WL 374188, at *4 . The Sixth Circuit recently issued a

"modest reminder" reaffirming the importance of that continued weighing. *See*

*Blakley*, 2009 WL 3029653, at *10. Indeed, among the errors identified by the

Court in *Blakley* was that ALJ's failure to clarify the weight given to the opinion

of a doctor who had acted as both a consulting expert and a treating physician. *See id.* at *8. The ALJ's comparable omission here gives rise to the same concern.

A review of Dr. Donnini's and Dr. Vitols' opinions does not reveal them to be "so patently deficient that the Commissioner could not possibly credit" them. *Wilson*, 378 F.3d at 547. In addition, the record does contain objective medical evidence lending to support both opinions. Consequently, the ALJ's errors in handling those opinions were not harmless. *See Bowen*, 478 F.3d at 747-48; *Wilson*, 378 F.3d at 546-47.

Accordingly, Plaintiff's challenge to the ALJ's evaluation of the medical source opinions is well taken.[4]

## VI. REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to

---

[4]In light of the above review and the resulting need for remand of this case, further analysis of Plaintiff's remaining contentions is unwarranted.

affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence Four is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of Drs. Vitols and Donnini under the legal criteria set forth in the Commissioner's Regulations and Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB or SSE. Accordingly, the case must be remanded to the Commissioner and the ALJ under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Mark A. Suggs was under a "disability" within the meaning of the Social Security Act during the period of time at issue;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.


September 29, 2009                  __s/Sharon L. Ovington__
                                        Sharon L. Ovington
                             United States Magistrate Judge

## <u>NOTICE REGARDING OBJECTIONS</u>

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).